# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

GIOVANI OROZCO RAMIREZ,

    Defendant.

CRIMINAL ACTION FILE

NO. 1:17-cr-185-LMM-AJB-01

(Superseding)

## UNITED STATES MAGISTRATE JUDGE'S
### FINAL REPORT AND RECOMMENDATION

Motions to suppress statements, [Doc. 67], and evidence, [Doc. 68], filed by Defendant Giovani Orozco Ramirez (hereinafter "Orozco" or "Defendant") were referred to the undersigned pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014) for a Report and Recommendation ("R&R") as to resolution. The Court held two evidentiary hearings on the motion to suppress statements, [Docs. 91 (hereinafter "T_") and 101 ("2T_")], after which the parties filed briefs. [Docs. 104 (Govt.), 110 (Def.), 118 (Govt.)]. With briefing completed, the Court **RECOMMENDS** that the motions be **GRANTED IN PART** and **DENIED IN PART**.

## I.  **BACKGROUND**

Orozco is charged in a superseding indictment with (1) conspiring with Brayan Lisandro Razo Bermudez (hereinafter "Razo") and others, between February 8 and April 26, 2017, to possess with intent to distribute at least 500 grams of methamphetamine, one kilogram of heroin, and 500 grams of cocaine, (Count One); (2) together with Razo, possessing with intent to distribute at least 500 grams of methamphetamine, one kilogram of heroin, and 500 grams of cocaine on April 26, 2017 (Count Two); (3) on the same date, together with Razo, possessing methamphetamine on a premises in which an individual who is under the age of eighteen years is present and resides (Count Three); (4) on the same date, together with Razo, possessing an AR-15 rifle, a shotgun, a revolver, and a handgun during a drug trafficking crime (Count Four); (5) on the same date, being an alien illegally in the United States and possessing the same firearms, which affected interstate and foreign commerce (Count Five); (6) conspiring with Razo, Eduardo Reyes Gonzalez, and others, between February 8 and April 26, 2017, to conduct financial transactions involving the proceeds of unlawful activity knowing that the transactions were designed to conceal the nature of the proceeds and to avoid

reporting requirements under Federal law (Count Seven); and (7) on February 8, 2017, committing money laundering (Count Eight).  [Doc. 42].[1]

He challenges certain pre-*Miranda* statements that he made when law enforcement executed a federal search warrant on April 26, 2017 at 440 Chimney Bluff, Alpharetta, Georgia 30022 (hereinafter "Chimney Bluff" or the residence), post-*Miranda* statements concerning the passcode to his cell phone, and the subsequent search of his cell phone.[2]

## II.    <u>FACTS</u>[3]

On April 26, 2017 at approximately 6:20 p.m., federal agents executed a federal search warrant at Chimney Bluff.  T6, 122; Govt. Ex. 1.  The execution

_____

[1]      The indictment also contains a forfeiture provision.  [Doc. 42 at 9-12].

[2]      At the evidentiary hearing, Orozco withdrew his motion to suppress evidence, [Doc. 68], in which he had argued that the house was searched before the warrant was executed,[*id.* at 1]; T181.  In any event, the evidence shows that the executing agents did not enter the residence, and the search was not conducted, until the search warrant was executed.  T109-10.  Accordingly, to the extent that the District Judge concludes that Orozco did not withdraw his motion to suppress, the undersigned **RECOMMENDS** that the motion to suppress evidence as to the search of the residence, [Doc. 68], be **DENIED**.

[3]      Although Razo filed a motion to suppress statements and participated in the first evidentiary hearing, he subsequently pleaded guilty to Counts One, Three, Four and Seven of the superseding indictment and was sentenced on February 20,

team was advised that the basis of the search warrant was that there was supposed to be a methamphetamine deal between Orozco and a confidential source.  T23. Initially, there were approximately 20 law enforcement agents on the scene, split evenly between agents who entered the premises to secure it and those who remained at first on the perimeter until the location was secured.  T114, 138-39. When the occupants of the residence did not respond to the agents' announcing of their presence, a battering ram was used to breach the door.  T115-16, 119, 125-26, 136-37, 146.  When the entry team entered the house their weapons were drawn. T136.  Once the location was secured, the weapons were put away.  *See* T165. Orozco initially was brought outside, guarded by a DEA Task Force Officer, who asked him if there were other persons in the house, and Orozco responded affirmatively by nodding his head.   T139-40; Deft. Ex. 2 at 1.   Betancourt (Orozco's wife) was the next to exit the location, accompanied by several children. T140-41.  Razo was found in the basement of the residence.  T130.  When the

_____

2019.  [Docs. 38, 91, 94, 111, 112].  As a result, his motion to suppress statements and evidence was deemed withdrawn.  [Doc 92].  In this R&R, the Court will not discuss the evidence and testimony elicited as to Razo at the evidentiary hearings unless it impacts Orozco's motions.

4

house's occupants were brought back inside the residence, the adults were separated from one another.  T74.

In executing the warrant, the agents found 22 kilograms of methamphetamine, a quantity of heroin, a quantity of cocaine, currency, and five firearms, including an AR-15, and ammunition.  T66, 68; Govt. Ex. 1.  Once the location was secured, the entry team departed, leaving about ten agents on the scene.  T123.  One of the agents who remained, DEA Special Agent Jose Collazo, is a fluent Spanish speaker.  T5-6.  One of Collazo's duties that day was to interview any Spanish-speaking subjects.  T5, 6.

The adults were questioned in the dining room area.  T8.  Each session began with questions, without the benefit of *Miranda* warnings, about biographical information and the agents recording their answers on a Form DEA 202.  T9; Govt. Ex. 5.[4]  The questions asked included name, birth date, place of birth, occupation, proof of identity, family members, children, and friends and associates.  T9, 10, 29, 55, 70, 71.  Collazo testified that that they were seeking "basic foundational information indicating that drugs were located at the residence, we wanted to see

---

[4]     Govt. Ex. 5 is a blank form; the completed DEA 202s were not introduced at the hearing.

who was at the residence, what the foundation is." T29.  He conceded that they wanted to get information about people who might be responsible for or have knowledge of the items located at the house.  T30.  He further described the pre-*Miranda* questioning as "standard," meaning that it was "customary for agents to interview people who are found at the residence where the dope is seized," T31; *see also* T48, although he also testified that these questions would be asked even if no contraband were found at a residence in an effort to get biographical information from persons they encounter.  T42-43.  Special Agent Vraa Jones added that they typically ask all of the questions on the form, but occasionally they do not.  T70-71. The biographical questions took between three and 10 minutes, depending on the person questioned.  T10, 22, 55, 58.  Orozco was handcuffed during his questioning.  T55.  However, during the entire questioning, the agents did not draw their weapons or threaten him.  T56.  He was not coerced or promised any benefit. T56.  Betancourt was questioned first, T56, and before being Mirandized, she identified Orozco as her husband, T65, and the children as hers and Orozco's.  T68. Once Mirandized, she invoked.  T75.  She was permitted to stay with her children while the residence was searched and the other adults were questioned.  T75.

Orozco then was questioned by DEA Special Agents Jones and Terrance Woodard and DEA Task Force Officer Sheldon Hogan.  T54-55.  Prior to being

6

advised of his *Miranda* rights, Orozco answered biographical questions that included the identity of his family members and that Betancourt was his wife. T55, 65. Upon being *Mirandized*, he invoked his rights to counsel and to not answer any further questions. T28, 56.

After Orozco invoked his rights, Collazo, Jones and Woodard questioned Razo. T14-18, 57. Razo stated that he lived in the house for a few months with Orozco and Betancourt and would occasionally chip in for groceries. T28, 35. Razo's questioning stopped when the agents determined that he was not being forthcoming. T59.

Several hours later, after the agents had secured the residence and the items they were seizing and were preparing to transport Razo and Orozco to the detention center, the agents were trying to figure how to arrange for transportation for Betancourt and the three or four children because there was no electricity at the location. T18, 61, 62, 103-04.[5] Orozco stated that he wanted to contact someone

---

[5]     The agents contacted the Division of Family and Children Services ("DFACS"), who advised that the children would not be permitted to stay in the residence. T77.

7

to pick up his children.  T61, 75.  Betancourt did not have the number of the person to be called.  T75.

The agents had seized a cell phone from Orozco.  T27, 104.  Jones asked Collazo to speak with Orozco about contacting this third person.  T27.  Collazo asked Orozco whether, since law enforcement had seized his phone, they could call a family member to assist in the transportation of his wife and children.  T18.  While Orozco still was handcuffed, Jones asked Orozco for the passcode to the cell phone and Orozco gave Jones the passcode so that she could access the phone to retrieve the person's phone number.  T62, 104.  Jones located the phone number in Orozco's phone, and Collazo spoke with that person before handing the phone to Orozco.  T61.  Orozco was overheard asking the person on the other end of the call to come and pick up his wife and children.  T37-38.  Later, after law enforcement obtained a search warrant for the cell phone, the cell phone was unlocked using the passcode and searched locally without being submitted to DEA forensics lab.  2T11.

At the second evidentiary hearing, the Government presented testimony from a digital forensic examiner at the DEA's evidence laboratory, who testified that as of May 2017, the DEA laboratory did not have the capability to unlock a Model A1662 iPhone running IOS version 10.3.1, the type of cell phone seized from Orozco.  2T16.  However, at the end of July 2017, Cellebrite, a private

company from whom the DEA lab purchases forensic tools, had software that could unlock that type of cell phone.  T18, 21.  In September 2017, Cellebrite made this technology available to the DEA lab, which then had the capability to extract data from that particular model and IOS combination.  2T17-19, 21.[6, 7]

### III.   PARTIES' CONTENTIONS

The Government contends that Orozco's pre-*Miranda* answers are not subject to suppression because they were standard biographical questions that are exempted from *Miranda* in order to secure biographical data to complete the booking process, [Doc. 104 at 6 (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990))], and the Government may seek to admit them even if the answers are incriminatory.  [*Id.* at 7 (citing *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983); *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991))].  It submits that the two questions Orozco challenges—concerning address and

---

[6]     The DEA laboratory can determine the model and IOS version of a cell phone using tools available from Cellebrite, even in the absence of the device's passcode.  2T20.

[7]     In October 2017, the agents applied for and received a search warrant for Razo's cell phone, which they could not previously search because it was passcode-protected.  The phone was sent to the DEA forensics laboratory and data was extracted it from it.  2T32-33.

familial information—are not subject to suppression just because they might be incriminating, pointing out that in *Sims*, the telephone number provided was the same one the government used at trial to prove that the defendant participated in an inculpatory phone call, 719 F.2d at 377-78; and in *Sweeting*, the court applied the biographical-information exception where officers found firearms in a house and then, pre-*Miranda*, asked the defendant his address, which matched the location where the guns were found. 933 F.2d at 965. [Doc. 104 at 7-8]. The Government claims that, to the extent that Orozco challenges answers he gave to other biographical questions, the exception applies with greater force because the answers Orozco gave to those questions were not inculpatory. [*Id.* at 8 n.3].

The Government next argues that the contents of Orozco's cell phone should not be suppressed because physical evidence obtained in reliance of non-*Mirandized* yet voluntary statements is admissible. [*Id.* at 8-10 (citing *United States v. Patane*, 542 U.S. 630, 634-37 (2004); *Missouri v. Siebert*, 542 U.S. 600, 618-19 (2004); *United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007))]. The Government states that it will not use in its case-in-chief the fact that Orozco provided them with the passcode. [*Id.* at 2 n.2]. The Government then contends that Orozco's statements (both the pre-*Miranda* familial information and the post-*Miranda* passcode) were voluntarily given because (1) throughout the entire

10

encounter with Orozco, the agents did not use undue force or threaten, coerce, or make any promises to Orozco, and (2) the agents needed someone to pick up Betancourt and their children since the house had no electricity, Orozco stated that there was such a person, and gave the agents the passcode to his cell phone so that this person could be called.  [*Id.* at 11].

Finally, the Government argues that even if the DEA unlawfully searched Orozco's cell phone by improperly using his un-*Mirandized* passcode, suppression is not warranted due to the inevitable discovery doctrine, because there is a reasonable probability that the DEA would have discovered the evidence on the cell phone by using the later-available software tool.  [*Id.* at 12-18].

In response, Orozco contends that because of the different perceptions that people of color have in police encounters, the Court must judge the voluntariness of his statements to "a cavalry of armed law enforcement agents"—as a young, uneducated, undocumented person of color—differently than it would view statements of an educated white person.  [Doc. 110 at 2].  Orozco argues that compliance in answering direct questions is different than voluntarily answering them.  [*Id.*].  In further support, he cites to the number of minority victims of recent police shootings and submits that the power dynamic is different when a "poor, young, uneducated person of color interacts with a police officer."  [*Id.* at 3].  He

11

argues that given the political climate in 2017, including hateful political speech and anti-immigrant rhetoric, he "would have been crazy to think that he had the independent free-will to refuse to answer the questions" since the "agents had taken his wife and four minor children from his presence and he was entirely powerless." [*Id.* at 4; *see also id.* at 5-7]. He contends that it was only when he was advised of his *Miranda* rights that he understood that he did not have to answer questions. [*Id.* at 4, 7].

Orozco then argues that he acquiesced to government authority in answering questions only after the agents forced their way into the house and he and his wife and children were removed from it and it was not until he was *Mirandized* that he refused to answer questions. [*Id.* at 7].[9] He argues that he was later tricked by the agents to give further admissions tying him to the cell phone. [*Id.* at 8-9]. He argues that his statements acknowledging that the cell phone was his and that he knew the passcode must be suppressed from the Government's case-in-chief, [*id.* at 9], apparently ignoring that the Government already has conceded as much. [*See* Doc. 104 at 2 n.2].

_____

[9]     Orozco repeatedly claims that these events occurred on September 26, 2017, however, the events at issue occurred on April 26, 2017.

As to the biographical answers that the Government seeks to introduce, Orozco argues that these are not subject to the so-called booking exception since they were elicited far from the jail house and were far from routine because they were propounded during the time the house was being searched for contraband. [Doc. 110 at 10, 14]. While acknowledging that routine booking questions do not violate *Miranda* (pointing out that in *Muniz* the questions were about his height, weight, address, eye color, date of birth and current age and were held to be reasonably related to " 'police administrative concerns,' " [*id.* at 11 (quoting *Muniz*, 496 U.S. at 601-02)], he argues that courts have concluded that investigative questions asked in the guise of routine booking questions do constitute interrogation requiring *Miranda* warnings. [*Id.* at 12-13 (citing *United States v. Glen-Archila*, 677 F.2d 809, 816 n.18 (11th Cir. 1982); *United States v. Henley*, 984 F.2d 1040, 1041 (9th Cir. 1993); *United States v. Virgen-Moreno*, 265 F.3d 276 (5th Cir. 2001); *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994))]. He further argues that *Henley* is particularly instructive since in that case the Ninth Circuit held that arresting agents' questioning the defendant about a vehicle used in a bank robbery did not fall within the booking exception because the agents should have known that the answers would incriminate him, and in the present case, Orozco was asked about his house, children, and alienage, even though the agents

13

already knew that methamphetamine, minor children, and firearms were discovered in the residence.  [*Id.* at 13-14].  Finally, Orozco argues that since the agents obtained Orozco's cell phone passcode by trickery, his statements were coerced and therefore *Patane* is inapplicable.  [*Id.* at 15].

The Government replies that nothing in the record demonstrates that Orozco's statements were the result of police coercion or overreaching, which is required for an involuntariness finding.  [Doc. 118 at 3 (citing *Miller v. Dugger*, 838 F.2d 1530, 1536 (11ᵗʰ Cir. 1988), and *Colorado v. Connelly*, 479 U.S. 157, 164 (1986))].  Because the record shows that the agents acted appropriately with Orozco, the government contends that the generalized allegations about the political and social climate are irrelevant in the absence of coercive police activity in this case. [*Id.*].  It also argues that the questions posed via the Form 202 are the precise sorts of questions allowed pre-*Miranda* by *Muniz*, and that the form is the DEA's standard intake form and contains questions " 'reasonably related to the [DEA's] administrative concerns,' " that is, identifying an individual who the agents have encountered and ascertaining his basic biographical information, even if such questions might be incriminating.  [*Id.* at 4 (citing *Muniz*, 496 U.S. at 600-01; *Sims*, 719 F.2d at 378)].  It adds that the fact that the DEA does not book arrestees into jail does not make to the body of precedent allowing pre-*Miranda* questioning for

14

administrative purposes inapplicable.  [*Id.* at 4].  As for the passcode that led to the search of the phone, the Government argues that Orozco effectively conceded that if he provided the passcode voluntarily the physical evidence obtained as a result is admissible under *Patane* and *Siebert*.  [*Id.* at 4-5].  Finally, it reiterates that if the statement about the passcode is deemed involuntary, then the Government's accessing the data on the cell phone was proper under the inevitable discovery doctrine.  [*Id.* at 4 n.3].

## IV.  **DISCUSSION**

### A.  **OROZSCO'S PRE-*MIRANDA* STATEMENTS**

In *Miranda v. Arizona*,  the Supreme Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. 436, 467 (1966).  To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealing with the accused.  In particular, prior to the initiation of questioning, they must fully apprise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  *Id.* at 468-70.

15

Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474.

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary. *Seibert*, 542 U.S. at 608 n.1; *Connelly*, 479 U.S. at 168; *Miranda*, 384 U.S. at 475.

There are exceptions to *Miranda*'s requirement that custodial questioning be preceded by appropriate warnings. Among those is the "well-established 'routine booking exception,' " under which a defendant's answers to questions designed to elicit the information necessary to complete booking may be used against him, even if those answers turn out to be incriminating. *United States v. Doe,* 661 F.3d 550, 567 (11th Cir. 2011) (quoting *Muniz,* 496 U.S. at 601). The routine booking exception permits the use of statements made in response to questions "reasonably related to the police's administrative concerns." *Muniz,* 496 U.S. at 601-02. The Eleventh Circuit has held, for example, that a suspect's pre-*Miranda* warning

16

responses to an officer's request for his address was admissible when there was no evidence that the question was intended to elicit an incriminating response. *See United States v. Brotemarkle*, 449 Fed. Appx. 893, 896-97 (11th Cir. Dec. 29, 2011) (citing *Sweeting*, 933 F.2d at 965); *see also Sweeting*, 933 F.2d at 965 (holding that an officer's request for " 'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating") (quoting *Sims*, 719 F.2d at 378-79); *see also Harryman v. Estelle*, 597 F.2d 927, 930-31 (5th Cir. 1979) (non-investigative questioning of detainees, such as biographical inquiries, not to be subject to *Miranda* rule); *United States v. Jones*, 457 F.2d 697, 699 (5th Cir. 1972) (holding it not necessary to give defendant *Miranda* warnings before asking him his name).

However, without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions. *Muniz*, 496 U.S. at 602 n.14 (citation and quotation marks omitted); *United States v. Glen-Archila,* 677 F.2d 809, 816 (11th Cir. 1982) (emphasizing that police may not use routine biographical questioning as a guise for obtaining incriminating information, and that even questions that usually are routine must be preceded by *Miranda* warnings if they are intended to produce answers that are incriminating) (citation omitted).  Moreover, although the routine-

17

booking exception is " 'phrased in terms of the officer's intention, the inquiry into whether [it] is thus inapplicable is actually an objective one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response.' " *United States v. Bunch*, No. 1:11-CR-136-JEC/AJB, 2012 WL 11799873, at *22 (N.D. Ga. Dec. 20, 2012) (quoting *United States v. Reyes*, 225 F.3d 71, 76-77 (1st Cir. 2000)), *report and recommendation adopted sub nom. United States v. McCullough*, No. 1:11-CR-136-JEC-AJB, 2014 WL 3955556 (N.D. Ga. Aug. 13, 2014).

Courts have held that questions necessary for the completion of the DEA 202 arguably fall under the "booking exception" which provides that asking routine questions reasonably related to the police's administrative concerns, such as general biological data, does not constitute interrogation under *Miranda*. *See United States v. Ratliff*, No. 4:08CR38/RH/GRJ, 2013 WL 12358502, at *5 (N.D. Fla. Oct. 16, 2013), *report and recommendation adopted,* No. 4:08CR38-RH/GRJ, 2013 WL 6383918 (N.D. Fla. Dec. 4, 2013) (citing *Muniz*, 496 U.S. at 601-02; *United States v. Pacheco-Lopez*, 531 F.3d 420, 423-24 (6th Cir. 2008); *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981); *United States v. Menichino*, 497 F.2d 935, 938 (5th Cir. 1974)).   The general rule, however, is only partially applicable in this case.

18

The Court concludes that some but not all of Orozco's pre-*Miranda* statements fall under the booking exception to *Miranda*. Although the Government could have shown more on this point, the DEA's administrative concerns are fulfilled in knowing the identity of the person with whom they are dealing, and the reasonable officer asking a suspect his identity would not have expected the question to elicit an incriminating response. *United States v. Wilson*, 238 Fed. Appx. 571, 575 (11th Cir. July 30, 2007) (per curiam) (finding provision of name during booking process is not subject to the protections of *Miranda*); *cf.*, *United States v. Farias-Gonzalez*, 556 F.3d 1181, 1189 (11th Cir. 2009) ("[T]he exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution[.]") (discussing Fourth Amendment). Although much closer, based on the record in this case, asking Orozco about his alienage or citizenship is not reasonably expected to be incriminating. *United States v. Estrada-Monzon*, No. 4:10-CR-53-RLV-WEJ, 2011 WL 2118955, at *4 (N.D. Ga. Apr. 25, 2011) ("Notably, questioning defendant about his citizenship, as it was reflected on the booking form, is not the same as questioning him about his immigration status."), *report and recommendation adopted*, No. 4:10-CR-53, 2011 WL 2073158 (N.D. Ga. May 24, 2011). Jones testified that Orozco was asked about his status in the United States and that he answered that question. T55.

19

However, the record of the hearing does not indicate what Orozco responded, and the blank DEA Form 202 in the record merely asks, at box 20, "Alien Status" and "Alien Registration No."   Govt. Ex. 5.   Given that the Government has responsibilities under the Vienna Convention when arresting a foreign national, and given the lack of information about how the question was asked and Orozco's response, the Court is unable to conclude that this question was outside the booking exception.

The question about Orozco's address is closer but the Court concludes that, given the lack of evidence that this was question was part of the DEA's administrative concern, the question and answer is not protected by the exception in this case.   True, a suspect's address is usually covered by the booking exception. *See Pacheco-Lopez*, 531 F.3d at 424 (recognizing that asking defendant his address was not protected by *Miranda* even though police made incriminating use of it) (citation omitted); *United States v. Fletcher*, No. 3:11-00083-15, 2012 WL 5963439, at *10 (M.D. Tenn. Nov. 28, 2012) ("[R]outine on the scene questions as to name and addresses . . . are not interrogation for *Miranda* purposes.").   Nonetheless, several factors support Orozco's position.   First, the Government's own witness testified that their training and practice involved determining who is responsible for the contraband located in a particular residence,

T29, 30, and in light of the stated purpose in asking the question, one would reasonably expect that asking a person's address in the circumstances here (particularly after Betancourt acknowledged where she lived and that Orozco was her husband) would be incriminating.[10]  *United States v. Goodrich*, No. 10-00229-01-CR-W-ODS, 2011 WL 4396933, at *9 (W.D. Mo. Aug. 31, 2011) (suppressing statements where, at the time the detective questioned the defendant, the detective knew that the defendant had been charged with possession of a firearm and narcotics and a reasonable detective would have anticipated that a pre-*Miranda* background question about who resided in the home with the defendant might elicit an incriminating response), *report and recommendation adopted*, No. 10-00229-01-CR-W-ODS, 2011 WL 4404118 (W.D. Mo. Sept. 21, 2011), *aff'd*, 739 F.3d 1091 (8th Cir. 2014).

Second, although less compelling, is the fact that the DEA was not actually booking any of the arrestees into jail, and thus the questioning about Orozco's address was for investigatory purposes that should have not been asked in the

---

[10]    The Court recognizes that Collazo did not question Orozco until after he was asked questions off the Form 202 and invoked his rights, but the Government did not elicit any information from Jones about the purpose or need for the questions based on the Form 202.

absence of a *Miranda* waiver.   *United States v. Chavez-Maciel*, No. 1:10-CR-00490-TCB-LTW, 2012 WL 6742323, at *10 (N.D. Ga. Dec. 7, 2012) (questions about defendant's aliases suppressed where agent admitted he was not booking defendant at the time he asked him about his aliases), *report and recommendation adopted*, No. 1:10-CR-490-1-TCB, 2012 WL 6738771 (N.D. Ga. Dec. 31, 2012). Thus, the agents' actions here were not related to the DEA's administrative concerns, but rather were part of a standard practice to get information about who was responsible for the contraband at the location.

Finally, the Government has not explained how asking Orozco about his children was part of the routine biographical questions excluded from *Miranda*'s protections, particularly since this information already was obtained from Betancourt.

**ACCORDINGLY**, the undersigned **RECOMMENDS** that Orozco's motion to suppress his pre-*Miranda* answers be **GRANTED** to the questions about his address and children but **DENIED** as to his name and alienage/status in the country.

### B.   OROZCO'S POST-*MIRANDA* STATEMENTS

After an accused invokes his right to counsel or right to remain silent, custodial interrogation must cease, and "*[o]nly* if the accused . . . voluntarily

initiates further communications can the agents pursue more information and interrogation." *United States v. Gomez*, 927 F.2d 1530, 1537 (11th Cir. 1991) (emphasis in original). A defendant's answers to further questioning in violation of this prohibition are not admissible in the Government's case-in-chief. *United States v. Ramsey*, 992 F.2d 301, 305 (11th Cir. 1993) (holding statement inadmissible when made after defendant invoked right to remain silent and agent continued encouraging cooperation); *Gomez*, 927 F.2d at 1536-37 (holding statement inadmissible because officer continued to talk to defendant after he invoked his right to counsel); *United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986) (holding statement inadmissible where agent asked suspect if he would like the federal criminal justice process explained after suspect invoked right to counsel); *see also Miranda*, 384 U.S. at 444-45; *United States v. Somers*, 591 Fed. Appx. 753, 757 (11th Cir. Nov. 14, 2014). As a result, the Government may not use in its case-in-chief Orozco's answers to questions posed to him about steps the agents wanted to take to have Betancourt and Orozco's children transported from the house, including any statements that Orozco made about owning a cell phone or providing the passcode to the cell phone. The Government does not dispute this result. [Doc. 104 at 2 n.2].

     **ACCORDINGLY**, the undersigned **RECOMMENDS** that Orozco's

motion to suppress his post-*Miranda* statements be **GRANTED**.

### C.   SEARCH OF OROZCO'S CELL PHONE

Not every violation of *Miranda* requires suppression of the evidence obtained. *Seibert*, 542 U.S. at 602. Thus, the Supreme Court has held that the Self-Incrimination Clause in the Fifth Amendment does not bar the admission of physical evidence that is the fruit of an unwarned but voluntary statement. *United States v. Jackson*, 506 F.3d 1358, 1360-61 (11th Cir. 2007) (citing *Patane*, 542 U.S. at 636 (plurality opinion); and *Patane*, 542 U.S. at 645 (Kennedy, J., concurring in the judgment)).

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller*, 838 F.2d at 1536. This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are

24

the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See*, *e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a sine qua non of effective consent. . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

In determining whether a defendant's will was overborne, the court must assess "both the characteristics of the accused and the details of the interrogation."

25

*Schneckloth*, 412 U.S. at 226.  Because it is appropriate to consider the suspect's individual characteristics (e.g., age, education, and intelligence), the test for voluntariness (unlike the *Miranda* custody test) involves a subjective inquiry. *Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004).  But while a defendant's individual characteristics may suggest that he was especially susceptible to police coercion, or even that he lacked the volitional ability to make a free and rational choice, the defendant's confession is nevertheless voluntary unless the police exploit that susceptibility or mental weakness with coercive tactics.  *Connelly*, 479 U.S. at 161-65; *id.* at 170 (the voluntariness inquiry "depend[s] on the absence of police overreaching, not on 'free choice' in any broader sense of the word"). Of course, any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

The Court concludes that Orozco's statements (including the ones that the Court recommends be excluded as not subject to the booking exception and those that are) and his post-*Miranda* statements about his phone and his passcode, were voluntary.  First, in any arrest there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the arrest

26

situation to obtain the consent. *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973); *see also United States v. Smith*, 199 Fed. Appx. 759, 763 (11th Cir. Sept. 15, 2006) (quoting *Jones*, 475 F.2d at 730). However, there is no evidence that the agents in this case used any more force than necessary to gain entry to the residence, secure it, and arrest Orozco and Razo. As to Orozco, he was questioned in his own home, the agents did not brandish their weapons at him at the time of the questioning, and no promises or threats were made to him. Particularly as to the statements concerning the passcode to his cell phone, it is evident that Orozco felt sufficient comfort to make a choice to invoke his *Miranda* rights and not answer any questions. In short, there is no evidence of any police coercion that rendered his statements involuntary.

To the extent that Orozco claims that the generalized political and social atmosphere in the United States at the time of his arrest rendered his statements voluntary, there is no evidence that the agents that he dealt with engaged in or exhibited towards him or anyone in the residence any racist or alienage animus. *United States v. Lynn*, 547 F. Supp. 2d 1307, 1308, 1310 (S.D. Ga. Feb. 13, 2008) adopted at 547 F. Supp. 2d 1307, 1308 (S.D. Ga. Mar. 4, 2008) (citation omitted) (finding defendant's statements were voluntary where although "defendant was clearly shaken by the intrusion into his home" by the agents' use of a battery ram

to force the door open to execute a warrant, "there [was] no evidence of record that he believed that he was in physical danger or that he had no choice but to cooperate with the agents" and "even if [he] had harbored such a subjective belief, his state of mind [was] immaterial without some indication of police misconduct").  Even if Orozco had harbored such a subjective belief as set forth in his brief, his state of mind is immaterial without some indication of police misconduct, and the record contains no such indication here.  *See United States v. Hill*, No. CR 114-028, 2014 WL 5410214, at *11 (S.D. Ga. Oct. 23, 2014) (citing *Connelly*, 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' ").

Nor does the Court find that the agents engaged in any deceptive conduct in an effort to get Orozco to disclose his passcode.  The uncontradicted evidence is that without electricity in the residence, DFACS advised the agents that the children could not remain in the house; inquiry was made of both Betancourt and Orozco regarding whether there was a third party who could transport Betancourt and the children from the residence; Betancourt did not have a phone number for the person identified but Orozco did; and Orozco was asked to provide the passcode and after he did so, he was handed the cell phone to personally communicate with this third

person.  There is no evidence that the whole scenario was concocted in order to trick Orozco into divulging his passcode, and the Court finds that there was none.

Therefore, because Orozco's statements were voluntary and not the result of police trickery or deception, *Patane* mandates that the subsequent search by warrant of Orozco's cell phone, access into which was accomplished by the passcode that Orozco provided, was lawful and the Government may seek to introduce at trial evidence seized as a result of that search.[11]

---

[11]     Because the Court concludes that the fruits of the search of Orozco's cell phone are not subject to suppression, the Court need not discuss in detail the Government's alternative argument that the search is saved by the inevitable discovery doctrine.  The inevitable discovery doctrine allows the admission of evidence if the government establishes "a reasonable probability that the evidence in question would have been discovered by lawful means," and that the lawful means which made the discovery inevitable were being actively pursued prior to the illegal conduct of the officer.  *See United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015).  This "active pursuit" means that the police would have discovered the evidence "by virtue of ordinary investigations of evidence or leads already in their possession."  *Id.*; *see also Nix v. Williams*, 467 U.S. 431, 443 (1984) (stating this doctrine allows admission of evidence "discovered by means wholly independent of any constitutional violation").  As the Eleventh Circuit has explained:

> For evidence to be admissible under the inevitable-discovery doctrine, the government must establish two things: (1) a "reasonable probability that the evidence in question would have been discovered by lawful means"; and (2) "the lawful means

## V.    CONCLUSION

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Defendant Giovani Orozco Ramirez's motions to suppress statements, [Doc. 67], and evidence, [Doc. 68], be **GRANTED IN PART AND DENIED IN PART**.   Specifically, the Court **RECOMMENDS** that Orozco's

_____

which made discovery inevitable were being actively pursued prior
to the occurrence of the illegal conduct."

*United States v. Bishop*, 683 Fed. Appx. 899, 907 (11th Cir. Apr. 3, 2017) (quoting *Johnson*, 777 F.3d at 1274).  The second requirement "does not require that police have already planned the particular search that would obtain the evidence."  *Id.* Instead, the government must "establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.' "  *Id.* (quoting *United States v. Virden*, 488 F.3d 1317, 1323 (11th Cir. 2007)).

In this case, the Government would have inevitably discovered the evidence on the cell phone " 'by virtue of ordinary investigations of evidence or leads already in their possession.' "  At the time that the Government first came into possession of the cell phone and were authorized to search it, the software necessary for the search was not available.  Within several months, through no apparent delay of the Government, the updated software tools became available.  *See United States v. Gaither*, No. CR 17-15-DLB-CJS, 2018 WL 1867163, at *12 (E.D. Ky. Jan. 17, 2018), *report and recommendation adopted*, No. CR 17-15-DLB-CJS, 2018 WL 1033457 (E.D. Ky. Feb. 22, 2018) (holding that doctrine applies where the government possessed the necessary leads to obtain the data by the date required by the warrants but the delay was caused by the internal factors of the incompatibility between the cell phones and the government's Cellebrite software.)

30

motion to suppress on the ground that the residence was searched before the warrant was signed and that the search of his cell phone was the fruit of any *Miranda* violation be **DENIED**; and that his motion to suppress statements about his residence, children, and his cell phone passcode be **GRANTED**  but that the motion to suppress statements as to his name and immigration status be **DENIED**.

The Court has now ruled upon all matters referred to it pursuant to Standing Order 14-02, (N.D. Ga. Aug. 15, 2014).  Accordingly, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED, RECOMMENDED, and CERIFIED**, this 22nd day of April, 2019.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

31